UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AMANDA PARDINI,

Plaintiff,

v.

NANCY BERRYHILL,

Defendant.

Case No. 18-cv-04878-JCS

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT AND REMANDING FOR FURTHER PROCEEDINGS**

Re: Dkt. Nos. 20, 23

## I. INTRODUCTION

Plaintiff Amanda Pardini brings this action appealing the final decision of Defendant Andrew Saul, Commissioner of Social Security (the "Commissioner"),[1] to deny Pardini's application for disability benefits under Title II of the Social Security Act. The parties have filed motions for summary judgment pursuant to Civil Local Rule 16-5. For the reasons discussed below, Pardini's motion is GRANTED, the Commissioner's motion is DENIED, and the matter is REMANDED to the Commissioner for further proceedings.[2]

## II. BACKGROUND

Amanda Pardini is a veteran of the United States Air Force who served in Kuwait, Iraq, and Mountain Home, Idaho between 2002 and 2006. Administrative Record ("AR") at 36. She was born in 1976. *Id*. at 35. She lives in an apartment in Ukiah, California with her young daughter. *Id*. at 206. *Id*. at 36. After her military service, Pardini worked as a housekeeping aid, an in-home care provider, a logistics coordinator, and a life insurance salesperson. *Id*. at 186. She

---

[1] Andrew Saul was confirmed as Commissioner while this action was pending and is therefore substituted as the defendant as a matter of law. *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).
[2] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

1  stopped working on January 1, 2010 because of her medical conditions and because she became

2  pregnant. *Id.* at 199. Pardini claims her conditions became severe enough to prevent her from

3  working two years later in January of 2012. *Id.* She alleges "1. PTSD; 2. Arthritis in neck and

4  back; 3. Anxiety." *Id.* at 198. She also testified to having a disabling knee injury. *Id.* at 42.

5      **A.    Pardini's Medical History[3]**

6          **1.  History of PTSD and Anxiety**

7      Pardini has a history of childhood sexual abuse. AR at 592. She also endured physical

8  abuse from her father. *Id.* at 536. Pardini's parents abused alcohol while she was growing up. *Id.*

9  at 640. In first grade, she was diagnosed with "a Comprehension Learning Disability" and placed

10  in special education classes until sixth grade. *Id.* at 593. In 2000, she was gang raped during a

11  party. *Id.* at 595. She was raped a second time in 2002. *Id.*

12      While serving in the military, Pardini was raped by a fellow service member in 2004 or

13  2005. *Id.* at 595, 602. When she reported the rape to her commanding officer, the officer

14  "instructed both of them to 'keep your distance from each other' and 'move on.' At that time, Ms.

15  Pardini felt extremely anxious regarding her military career and physical safety from that point

16  forward." *Id.* at 595-96. In 2005, Pardini was "physically attacked and groped" by a store clerk

17  on a military base. *Id.* at 596.

18      On November 4, 2009, Pardini's physical therapist noted that Pardini was experiencing

19  "[d]epression daily – due to not having a job, stress, not able to pay her bills – declines medication

20  or help." *Id.* at 704. Pardini also experienced depression while she was pregnant, which she

21  attributed in part to her relationship with her daughter's father. *Id.* at 277. On March 30, 2010,

22  Pardini underwent a PTSD screening test where she indicated that in the past month, she

23  experienced nightmares and intrusive thoughts, avoided situations that reminded her of the sexual

24  assaults, was easily startled, and "[f]elt numb or detached from others, activities, or [her]

25  surroundings[.]" *Id.* at 318. Her score was positive for PTSD. *Id.*

26      Pardini applied for veteran's benefits based on her PTSD in 2010 but was denied "because

27

28  [3] The Court summarizes here only the portions of Pardini's medical history that are relevant to its
review of the ALJ's decision.

1  the claimed stressor could not be verified." *Id.* at 180.  She filed a Notice of Disagreement on

2  June 14, 2010.  *Id.*

3      When Pardini moved to Ukiah, California, she was referred to Clare Friedlander, LCSW,

4  after requesting a female therapist.  *Id.* at 735.  At their first meeting, on August 10, 2010,

5  Friedlander noted that Pardini's chief complaints were "[a]voidant symptoms of PTSD, irritability

6  contributes to frequent job losses."  *Id.* at 729.

7      Friedlander noted that Pardini's concentration was "intact" and her memory was

8  "unimpaired."  *Id.*  On August 12, 2010, Friedlander noted:

> [S]he was sexually assaulted while deployed in Iraq and also while in the military and stationed in Idaho.  As a result, she does not go into stores alone, does not go into enclosed places, does not allow herself to be alone with men.  She reports, "I stay at home and don't go anywhere". . . . she has intrusive memories and flashbacks of the sexual assaults.  She avoids going to stores, being in enclosed places, [and] being one on one with men . . . . She has trouble falling asleep and staying asleep and is frequently irritable.  She has nightmares of sexual assaults 2-3 times per week, flashbacks occur about 2 times per month.

15  *Id.* at 725, 727.

16      On August 23, 2010, Pardini described one of the sexual assaults she endured while

17  deployed in Kuwait.  *Id.* at 724.  Friedlander noted that "[s]ince this assault [Pardini] has not been

18  comfortable in social situations, does not have fun, and does not go places alone.  These

19  experiences have affected her subsequent relationships with men."  *Id.*  Friedlander's assessment

20  was "PTSD related to history of multiple sexual assaults."  *Id.* at 722.

21      On September 10, 2010, a "PCL-C[4] was performed and was positive" for PTSD.  *Id.*

22  According to the PCL-C, Pardini was experiencing several symptoms of PTSD.  *Id.* at 722-23.

23  The PCL-C noted: "Information contained in this note is based on a self report assessment and is

---

[4] "A 'PCL-C' is a standardized self-report rating test for post traumatic stress disorder comprised of seventeen items that correspond to the core symptoms of post traumatic stress disorder. It is self administered, and respondents indicate how much they have been bothered by a particular symptom over a particular time period using a five-point scale." *Stroman v. Colvin*, No. 4:14-CV-03022, 2016 WL 5171534, at *8 (S.D. Tex. Feb. 17, 2016) (citing United States Department of Veterans Affairs PTSD Checklist –Civilian Version (PCL–C), http://www.mirecc.va.gov/docs/visn6/3_PTSD_CheckList_and_Scoring.pdf.).

not sufficient to use alone for diagnostic purposes.  Assessment results should be verified for accuracy and used in conjunction with other diagnostic activities." *Id*. at 724.

On September 24, 2010, Pardini and Friedlander "[d]iscussed specific avoidant behaviors." *Id*. at 720.  Pardini explained that "she enjoys going places as long as she is accompanied by someone, but becomes anxious when she goes alone." *Id*.  By her next appointment, on October 8, 2010, Pardini had been "to a couple of large crowded stores . . . [and] felt completely comfortable." *Id*. 719.  She "deni[ed] any avoidant symptoms" of PTSD.  *Id*.  However, "[w]hen asked about sleep, [Pardini] reports that she sleeps about one hour per night because she hears noises and thinks that someone is outside or that someone is going to break in. . . . She feels anxious when she is home alone and always locks the doors." *Id*.  Besides that, Pardini reported that "she is healthy and happy." *Id*.  On November 4, 2010, Friedlander noted that Pardini was "[n]o longer experiencing avoidant or arousal symptoms of PTSD." *Id*.

Pardini re-took the PCL-C on December 3, 2010.  *Id.*  at 716-717.  This time, it "was negative" for symptoms of PTSD.  *Id*. at 716.  Friedlander reported that Pardini "[c]ontinues to be relatively free of PTSD symptoms (arousal, avoidance, re-experiencing)." *Id*. at 715.  At a visit with Friedlander on August 5, 2011, Pardini noted her mood was "happy" but that she "[found] herself unable to focus on school." *Id*. at 703.  On September 26, 2011, Friedlander noted that Pardini was "[n]o longer experiencing avoidant, re-experiencing, or arousal symptoms of PTSD . . . . Initial goals of therapy have been met and [Pardini] has made positive changes in her life." *Id*. at 702.

On December 13, 2011, Pardini left Friedlander a voicemail in which she "sounded distraught," saying that "she needs housing and can't stand her current living situation any more." *Id*. at 701.  She was not suicidal or thinking of harming herself.  *Id*.  At a follow-up appointment on December 16, 2011 Friedlander recorded that Pardini "[c]ontinues to be free from avoidant, re-experiencing, or arousal symptoms of PTSD.  Experiencing stress in her housing situation and is at high risk of homelessness." *Id*.

Pardini applied for a HUD voucher with Senior Social Worker Corenna Mitcham, LCSW, on January 9, 2012.  *Id*. at 700. On the intake application, Mitcham noted that Pardini was

"[d]iagnosed with PTSD and arthritis in lower neck and lower back." *Id.* at 698. On January 2, 2012, Pardini reported to Friedlander that she was "working as a babysitter for 3 hours, 3 times a week at the home of a family that has 2 toddlers . . . . These opportunities to get out of the house are helpful, as there is a lot of tension between her and other family members at home." *Id.* at 696. Pardini took a third PCL-C, answering "not at all" to all questions about her PTSD symptoms. *Id.* at 694. Pardini's mental health interdisciplinary treatment plan, completed on April 26, 2012, noted "[p]osttraumatic stress disorder per remote records, no current symptoms reported." *Id.* at 690. Pardini reported to Friedlander "that she no longer has any symptoms of PTSD." *Id.* at 689.

On September 5, 2012, Pardini gave her informed consent to be part of a study on PTSD and chronic pain. *Id.* at 662.

On October 4, 2012, Pardini was placed in housing on a "voucher." *Id.* at 641. A psychosocial assessment by Mitcham, dated November 2, 2012, states that Pardini reported that she had "'moved on' from past sexual abuse and rape." *Id.* at 641. Later that month, Pardini reported that she was babysitting her nephew six hours per day, five days per week. *Id.* at 638.

On March 8, 2013, Pardini "presented as very upbeat" and optimistic about events in her life, including being housed, being paid to watch her nephew, and working as a secretary at her daughter's school. *Id.* at 608. She completed the PTSD study on March 16, 2013. *Id.* at 607. At a home visit on March 21, 2013, Pardini told Mitcham that she was "anxious and nervous" about her "upcoming comp and pen[5] appt." *Id.* at 606-07. During that home visit, Pardini and Mitcham discussed Pardini's military sexual assault. *Id.* at 607. Pardini "shared she suffers from nightmares, hypervigilance, fear of men, inability to hold down a job, amongst other issues she says have been a fallout from the assault." *Id.*

Part of the compensation and pension assessment was "a VA examination for PTSD." *Id.* at 180. VA psychologist Allison Broennimann, Ph.D., administered an "Initial Post Traumatic Stress Disorder (PTSD) Disability Benefits Questionnaire" on March 25, 2013 as part of Pardini's compensation and pension examination. *Id.* at 587-606. Dr. Broennimann noted that Pardini

---

[5] This refers to the "compensation and pension" exam administered by the Department of Veteran's Affairs. *See* AR at 587.

5

experienced occupational problems as a result of her PTSD, explaining that she "is unemployed and unable to maintain employment; [s]he has showed consistent difficulty with maintaining employment. . ." *Id*. at 590.  Pardini told Dr. Broennimann:

> her symptoms of PTSD progressively worsened upon leaving the military. . . . She reported that her symptoms of PTSD, such as anger management, irritability, recurrent and distressing memories have been present since her service in the military.  Her emotional responses are beginning to return and her goal is to continue working in psychotherapy to process her trauma.

*Id*. at 594.  Dr. Broennimann assessed Pardini as having "[t]otal occupational and social impairment." *Id*. at 591.

Dr. Broennimann noted that Pardini "persistently reexperienced" the traumatic event through "[r]ecurrent and distressing recollections of the event, including images, thoughts or perceptions; [r]ecurrent distressing dreams of the event; [and p]hysiological reactivity on exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event." *Id*. at 597.  She also noted Pardini's "[p]ersistant avoidance of stimuli associated with the trauma" through "[e]fforts to avoid thoughts, feelings or conversations associated with the trauma; [e]fforts to avoid activities, places or people that arouse recollections of the trauma; [m]arkedly diminished interest or participation in significant activities; [and f]eeling of detachment or estrangement from others." *Id*.  Her "[p]ersistent symptoms of increased arousal" associated with her PTSD included "[d]ifficulty falling or staying asleep; [i]rritability or outbursts of anger; [d]ifficulty concentrating; [h]ypervigilance; [and e]xaggerated startle response." *Id*.  These symptoms lasted for more than a month. *Id*.  Dr. Broennimann indicated that "[t]he PTSD symptoms described above cause clinically significant distress or impairment in social, occupational, or other important areas of functioning." *Id*. at 598.

According to Dr. Broennimann, Pardini was also experiencing the following symptoms of PTSD:

> Depressed mood; Anxiety; Suspiciousness; Panic attacks more than once a week; Near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; Chronic sleep impairment; Mild memory loss, such as forgetting names, directions or recent events; Flattened affect; Disturbances of motivation and mood; Difficulty in establishing and maintaining

> effective work and social relationships; Difficulty in adapting to stressful circumstances, including work or a worklike setting; Inability to establish and maintain effective relationships; [and] Neglect of personal appearance and hygiene.

*Id.* at 598-99. "It is clear to this provider," Dr. Broennimann wrote, "that Ms. Pardini's PTSD is a direct result of her experience of [military sexual trauma] during her Army service in Iraq." *Id.* at 604.

The medical opinion request to Dr. Broennimann alerted her as to inconsistencies regarding the details of Pardini's alleged sexual assaults:

> Vet states report was filed at Tallil Airbase, Iraq however investigative report was unable to confirm. . . . Post Deployment questionnaire 2/3/06 does not show any indication of stressor. VAMC references to MST appear to be inconsistent. No markers were found in relation to the claimed incident in 12/2005. Please carefully review evidence and chronology.

*Id.* at 602 (internal citations omitted). Nevertheless, Dr. Broennimann found that "these markers are at least as likely as not indicative that a MST stressor occurred within service." *Id.* at 604. Dr. Broennimann concluded that Pardini had "a diagnosis of PTSD that conforms to DSM-IV criteria." *Id.* at 588. Based on Dr. Broennimann's report and their review of Pardini's treatment record through February 9, 2013, the VA found Pardini "100 percent" disabled. *Id.* at 173.

On October 10, 2013, Friedlander re-administered the PCL-C test for PTSD, which "was negative." *Id.* at 540. Friedlander wrote: "The patient is no longer in active treatment for PTSD." *Id.* at 541. The next day, Friedlander completed a treatment update for Pardini. *Id.* at 534. She wrote "Veteran is 100% SC for PTSD . . . . Denies current symptoms of PTSD." *Id.* at 535; *see also id.* at 536 ("The veteran reports that she no longer has symptoms of PTSD.").

On May 9, 2014, Dr. Harvey Bilik, Psy.D. completed a review of Pardini's record in connection with her initial application for disability benefits. *Id.* at 77-78. He evaluated the opinions of Dr. Broennimann, a treating medical source, and Friedlander, who was not an acceptable medical treating source. *Id.* at 79; *see also id.* at 72-73 (designating types of sources). Based on his review of the record, Dr. Bilik found that Pardini's impairments were not severe: "03–12–14 LCSW note indicates clmt takes no psychotropic RX, no substance abuse issue, lives with young daughter, has extensive family support available, travels extensively, and is going to

school online for two degrees. Suggest not severe disposition." *Id*. at 78. Consultative physician Dr. Jaintuni reviewed the same records and opined that Pardini's alleged anxiety disorder was not severe. *Id*. The consultative physicians determined that Pardini was not disabled. *Id*. at 79.

In her request for Reconsideration, however, Pardini wrote that, as of March 2014, "her condition has gotten a lot worse. She is extremely depressed and mentally cannot handle anything. She has a lot more anger and is unable to handle[ ] situations in a calm manner." *Id*. at 83. Nevertheless, L. Colsky, M.D., based on a review of the record, affirmed Dr. Bilik's finding that Pardini's limitation attributable to PTSD was not severe and that she was not disabled. *Id*. at 89-90.

By June 15, 2014, Pardini had been charged with fraud for her failure to report her change in income and "fac[ed] possible jail time and eviction." *Id*. at 773. This led Pardini "to report feeling somewhat depressed and worried." *Id*. However, Friedlander noted that Pardini "[c]ontinues to be free from avoidant, re-experiencing, or arousal symptoms of PTSD." *Id*. On June 10, 2014, Licensed Vocational Nurse Laurie Handegard noted that Pardini had a positive score for depression. *Id*. at 775.

In a pre-operative review of systems conducted January 20, 2015, Pardini "deni[ed] anxiety, PTSD, depression, or SI/SA." *Id*. at 926; *see also id*. at 932 ("Denies Depression + PTSD"). On April 15, 2015, Pardini indicated on a health questionnaire that she "OFTEN [felt] sad, down or hopeless." *Id*. at 796. Pardini claims that, as a result of her PTSD, she "feels more stressed than usual, cannot walk around by herself, and has intrusive memories of all the incidents that have happened to her in the past." *Id*. at 269 (citing *id*. at 282).

## 2. History of Knee Injury and Pain

Pardini also alleges that she is disabled due to a knee injury she sustained in 2012. On December 11, 2012, Pardini visited Mendocino Community Health Clinic with right knee pain caused when her daughter "jumped on her right knee." *Id.* at 375. The provider noted that Pardini "[h]as pain since then. It hurts when walks, bends it, stairs, and in bed. It feels a little swollen." *Id*. The doctor prescribed an ice pack and Naproxen. *Id*. at 376. However, the pain worsened, and Pardini reported "bruising, decreased mobility, locking and night pain" on January 18, 2013.

*Id*. at 388. An examination of her knee revealed a full range of motion, "although pain with the last 30 degrees of extension." *Id*. at 389. Her McMurray's[6] test was positive as to the lateral meniscus and guarded as to the medial meniscus, indicating a "possible meniscus injury." *Id*. She was given a knee sleeve and referred to physical therapy. *Id*. at 389-90.

On January 26, 2013, Pardini told researchers from the "Veterans With Pain Study" that she had "a new source of pain that she has been coping with, a knee injury that occurred in November 2012." *Id*. at 620. Physical therapy treatment notes indicate that Pardini improved with physical therapy, eventually being able to "go up and down stairs without pain." *Id*. at 395. She continued to have pain while "squatting down to the floor," reaching an eight out of ten on March 6, 2013. *Id*. at 414. *See also id*. at 396 ("3/11/13: Increase in pain after 15 single leg squats on Total Gym."). Pardini's final physical therapy treatment record on April 23, 2013 noted: "Functional limitations include the following: unable to squat deeper than 50% without pain which makes getting down on the floor and back up when performing household chores and caring for daughter and nephew.[7] No more difficulty with stairs or kneeling. Gait pattern normal." *Id*. at 397.

The physical therapist's final assessment upon discharging Pardini noted:

> Patient has made great progress in physical therapy as she has met most of her goals. Main limitation remaining is squatting. She will benefit from continued services to update and advance her HEP [Home Exercise Program] as well as manual therapy techniques to improve patellar tracking and quad control with deep squats. Due to no additional authorization as well as not hearing back from patient, she is being discharged at this time with goals mostly met.
> Plan: Discharge to HEP.

*Id*. at 396.

On June 10, 2014, Dr. Paul Hupp conducted Pardini's annual primary care visit. *Id*. at 776-78. He wrote that Pardini's kneecap had "popped out of alignment" but that "PT was able to massage it back in." *Id*. at 776. Dr. Hupp wrote that he "suspected" degenerative joint disease in

---

[6] "The McMurray test evaluates for the presence of a meniscal tear. A negative test indicates there is no evidence of tear." *Braunstein v. Berryhill*, No. SACV 16-01026-KES, 2017 WL 923901, at *7 (C.D. Cal. Mar. 8, 2017) (citing http://stanfordmedicine25.stanford.edu/the25/knee.html).
[7] This sentence is quoted verbatim from original.

9

Pardini's kneecap ("patella DJD"). *Id*. at 777. In a June 15, 2014 report to Pardini describing findings from June 10 x-rays, Dr. Linda Mulligan wrote, "your right knee x-rays show narrowing . . . likely related to wearing down of cartilage. You have similar finding of worn down cartilage behind your knee cap. Your knee cap is partially dislocated laterally (outer aspect)." *Id*. at 742. Dr. Mulligan ordered Pardini a knee brace and listed a provisional diagnosis of "[r]ecurrent subluxation of the patella."[8] *Id*. at 761.

Dr. Mulligan also ordered a scan of Pardini's knee, which was performed on June 24, 2014. *Id*. at 752. Dr. Virginia Griswold, the attending radiologist who interpreted the scan, found "moderate narrowing of the joint space of the patellofemoral joint with a lateral subluxation of the patella." *Id*. at 754. She opined that the scan was "suggestive of osteoporosis." *Id*. at 755.

Pardini underwent her first knee MRI on August 21, 2014. *Id*. at 823. While radiologists Dr. Rizwan Aslam and Dr. Jeffrey Kao found "[n]o evidence of [bone] fracture, contusion or edema," they did find "[r]adial tear of the posterior horn of the lateral meniscus . . . . Medial meniscus demonstrate normal signal and morphology without evidence of intrasubstance degeneration or discrete tear." *Id*. The MRI also found "fraying and decreased thickness and areas of complete cartilage loss with associated subchondral edema due to chondromalacia patella." *Id*. at 824. The radiologists' overall impression was "1. Radial tear of the posterior horn of the lateral meniscus. 2. Chondromalacia patella." *Id*.

Pardini's doctors decided on surgery. *Id*. at 939. In an operation report from January 30, 2015, orthopedic surgeon Dr. Anthony Ding wrote:

> Initially, we attempted 3 months of physicla [sic] therpay [sic] without substantial improvement in her symptoms. Her pain was also refractory to anti-inflammatories and activity modification. An informed discussion was had with the patient regarding the risks and benefits of surgical intervention. . . . The patient recognized these risks and agreed to proceed with surgery.

*Id*. at 943. Orthopedic surgeons "offered [Pardini] a Fulkerson osteotomy . . . but she preferred to

---

[8] Subluxation "happens when [a] kneecap slides a little out of place but doesn't dislocate entirely." "What Can Go Wrong With My Kneecap?" *WebMD*, https://www.webmd.com/pain-management/knee-pain/kneecap-problems-symptoms#1-3.

have a less extensive intervention." *Id.* The pre-operative exam conducted by Dr. Michael Contini revealed a full range of motion in Pardini's right knee, but "noted increased pain w/end range flexion. *Id.* She also had "5/5" strength in her extremities and "3–4/10" right knee pain. *Id.* Dr. Micah Naimark, one of the orthopedic surgeons who performed Pardini's knee surgery, conducted an operative report on January 31, 2015. *Id.* at 943-45. Dr. Naimark reported that Pardini's pain had not improved with physical therapy, anti-inflammatory medication, or "activity modification." *Id.* at 892.

Pardini underwent an arthroscopy[9] and lateral patellar release[10] of her right knee on January 30, 2015. *Id.* at 896-919. The arthroscopy revealed a postoperative diagnosis of "right knee patella chondromalacia."[11] *Id.* at 912. In a follow-up with Dr. Alexis Dang, Pardini's other orthopedic surgeon, Pardini reported that she was "walking 3 miles a day," felt less grinding in her knee, that her knee felt "in place compared to before," even though she did feel "some pain laterally." *Id.* at 888 (dated March 23, 2015).

Pardini fell down the stairs in September of 2015 and reinjured her knee. She saw her primary care physician on October 8, 2015 and told him that "she fell about a month ago going down stairs in the dark. Skipped 3 stairs and landed straight on both knees. Right knee grinds, swells, and hurts, indicating medial jointline. Left okay." *Id.* at 857.

On November 25, 2015, x-rays of Pardini's right knee "identified" "no acute fracture or dislocation," according to interpreting doctor Virginia Griswold, M.D. *Id.* at 821. Dr. Griswold

---

[9] An arthroscopy "is a procedure for diagnosing and treating joint problems. A surgeon inserts a narrow tube attached to a fiber-optic video camera through a small incision — about the size of a buttonhole. The view inside your joint is transmitted to a high-definition video monitor." "Arthroscopy: Overview," *Mayo Clinic*, https://www.mayoclinic.org/tests-procedures/arthroscopy/about/pac-20392974.

[10] "A lateral release is a surgical procedure on the knee used to realign the kneecap (patella). The lateral release is performed as an arthroscopic knee surgery and can be performed as an outpatient. The usual reason to perform a lateral release is to correct a partially dislocated (subluxated) kneecap that is causing pain." "Lateral Release of the Knee Overview," *VeryWell Health*, https://www.verywellhealth.com/lateral-release-2549589.

[11] "Chondromalacia patella is abnormal softening of the cartilage of the 'underside the kneecap (patella). . . . Chondromalacia patella is one of the most common causes of chronic knee pain. Chondromalacia patella results from degeneration of cartilage due to poor alignment of the kneecap (patella) as it slides over the lower end of the thighbone (femur).'" *Yaris v. Colvin*, No. 14-CV-551-JTC, 2016 WL 824446, at *5 (W.D.N.Y. 2016).

did observe "a new soft tissue bulge along the right lateral aspect of the knee," which she opined could be from an injury or Pardini's knee surgery. *Id*. at 822. In addition, the x-ray revealed "moderate medial compartment joint space" that is "consistent with chondropathic disease." *Id*. There were also "several horizontal linear radiodensities" that "may indicate decreased bone mineral density such as osteopenia/osteoporosis." *Id*. Dr. Griswold referenced the MRI from August 21, 2014, which "reported in part a radial tear of the posterior horn of the lateral meniscus and chondromalacia patella." *Id*. She also wrote that if Pardini's symptoms persisted or worsened a repeat x-ray, MRI or CT scan should be considered to "detect a hairline non-displaced fracture that is occult by plain film exam." AR at 820-821.

On November 30, 2015, Pardini saw orthopedic surgeon Dr. Alan Dang. *Id*. at 848. He summarized what had happened since her surgery:

> Surgery/therapy went great. Wanted PT renewal and renewal was placed but she did not know, so she feels as if her PT was shorter than ideal. Overall happy until September.
>
> In September, she fell down her stairs and developed bilateral knee pain again. Slipped down 3 stairs and landed hard on her knees. Now 7–8/10 knee pain on a regular basis esp. going up/down stairs. Not that different to compare ascent vs. descent. She does advocate mild subjective catching on the right knee.
>
> Both sides hurt, but the right hurts more. Some localized tenderness to bilateral lateral tibial plateau at joint line. Some pain with patellar loading. Zero pain with varus/valgus loading. No laxity anterior/posterior. Negative thessaly/mcmurray[12] bilaterally.
>
> Xrays show no fracture of the right knee. . . .

*Id*. He added "overall, benign appearing exam with no strong findings for meniscal tear. There may be some mild patellar maltracking related to decondition+the fall." *Id*. Dr. Dang ordered an MRI and placed Pardini on Meloxicam. *Id*.

An MRI of Pardini's right knee was performed on December 14, 2015. *Id*. at 819. It revealed that cartilage in Pardini's medial and lateral compartments were normally thick. *Id*. at

---

[12] The Thessaly and McMurray tests are tests for meniscus tears. *See* C. Bunt, C. Jonas, and J. Chang, "Letter to the Editor: Thessaly vs. McMurray Test for Diagnosis of Meniscal Injuries," *Am Fam Physician*. 2019 Aug 15; 100(4):200-201, https://www.aafp.org/afp/2019/0815/p200.html.

819. It showed no evidence of a tear in Pardini's meniscus. *Id.* at 814-15. However, interpreting radiologist Dr. Stefanie Weinstein found that the results were "suggestive of bony demineralization" and documented "[l]ateral patellar offset without evidence of significant degenerative change." *Id.* at 816. Overall, Dr. Weinstein found that "[r]ight knee findings are without significant change from MRI 8/21/14." *Id.* at 820.

## B. Finding of Disability by the VA

On October 26, 2009, Pardini applied to the Department of Veterans Affairs for disability benefits based on PTSD connected to her military service. AR at 173. Her claim was initially denied on March 24, 2010. *Id.* On June 14, 2010, she filed a Notice of Disagreement with the VA, which reversed the denial in a decision dated May 25, 2013. *Id.* at 172. In reaching its decision on appeal, the VA conducted a "comprehensive review of the evidence," which included treatment records from the period when Pardini was in the military, between 2002 and 2006; VA medical records from Spokane, Washington for the period March 30, 2010 through September 6, 2011; and VA medical records from San Francisco for treatment Pardini received between July 21, 2010 and February 9, 2013 (including treatment notes from LCSW Friedlander). *Id.* Because these records "showed several possible markers indicating a traumatic event may have occurred," the VA requested a VA examination for PTSD, which was conducted on March 25, 2013 by Dr. Broennimann. *Id.*; *see also* AR 587-605. Based on the medical records and Dr. Broennimann's findings (discussed in detail above) the VA found that Pardini was 100% disabled as of October 26, 2009 based on her service-related PTSD. *Id.* at 173. It stated that its determination of disability was based on:

- Anxiety
- Chronic sleep impairment
- Depressed mood
- Difficulty in adapting to a worklife setting
- Difficulty in adapting to stressful circumstances
- Difficulty in adapting to work
- Difficulty in establishing and maintaining effective work and social relationships
- Disturbances of motivation and mood
- Flattened affect
- Inability to establish and maintain effective relationships
- Mental condition has been formally diagnosed
- Mild memory loss
- Near-continuous panic affecting the ability to function

independently, appropriately and effectively
- Neglect of personal appearance and hygiene
- Panic attacks more than once a week
- Suspiciousness
- The examiner's assessment of your current mental functioning, which is partially reflected in your Global Assessment of Function score [of 43] []
- Total occupational and social impairment

*Id*. at 174.

## C. Procedural History

Pardini applied for Disability Insurance Benefits on March 31, 2014. *Id*. at 154. She alleges an onset date of January 1, 2010. *Id*. Her application was denied initially on May 13, 2014 and upon reconsideration on July 21, 2014. *Id*. at 94. She filed a written request for a hearing, which was held on August 16, 2016. *Id*. at 30-69, 107-108

## D. Administrative Hearing

At the hearing, ALJ Wynne O'Brien-Pearsons presided. *Id*. at 30. Pardini's attorney, Nancy Combs, started by questioning her client, who told the ALJ that she had lost weight to "help with the pain in the knee." *Id*. at 35-36. She described her military service: "I served most of my time in Mountain Home, Idaho. I deployed twice --once to Kuwait and once to Iraq." *Id*. at 36. Pardini discussed her relationship with her sister, who lives next door and helps with childcare. *Id*. at 36-37.

The attorney then asked how Pardini's PTSD adversely affected her relationship with her daughter. *Id*. at 37. Pardini replied that she sometimes felt overwhelmed and stressed, and that her daughter could sense her stress, making Pardini "realize that I need to step back and calm myself down." *Id*. at 38. She testified that her mother and a friend also help her take care of her daughter. *Id*. at 38-39.

Pardini testified that she was sexually assaulted in Iraq, which caused her PTSD. *Id*. at 39. She testified that she experienced some anxiety while driving around in the city. *Id*. at 40. She then explained that, while she had "three Associates, a Bachelor's and a Master's" degree, she earned her Master's degree online because "[y]ou don't have to go in every day and, and sit in [a] crowded, crowded classroom." *Id*. at 40-41.

Pardini testified that the onset date of her disability due to PTSD was January 1, 2010, and

that her last job ended because she argued with her boss and a fellow housekeeper. *Id*. at 41. Since then, she testified, her only paid work had been taking care of her young nephew. *Id*. at 42. She testified that her sister had paid her around $300 a month but stopped paying her two years before the hearing when her sister's "benefits were terminated," though Pardini continued to care for her nephew sometimes. *Id*. at 42, 56.

The lawyer then asked whether Pardini had "physical impairments" in addition to her PTSD. *Id*. at 42. Pardini described her knee surgery in January 2015, in which "[t]hey did a lateral release." *Id*. She explained that, even though she participated in physical therapy, "[i]t's gotten worse. . . . it's hard to walk without pain or grinding." *Id*. Stairs were particularly difficult, she testified, adding that if she was "on it for more than 15 minutes [she had] to sit and ice it or brace it" because she starts to experience pain and swelling. *Id*. at 42-43.

Pardini also testified that her PTSD affected her memory. *Id*. at 43. She recounted an incident in which she couldn't remember recent conversations she had had with parents of children on her daughter's skating team. *Id*. at 43-44. She testified that she also had difficulty concentrating and focusing. *Id*. at 44-45. Pardini compared her experience trying to pass the life insurance representative test, which took her "a year or a year and a half" to pass, with her pursuit of a Master's degree online. *Id*. at 45. The two experiences were different, she explained, because "[t]he Master's degree was a lot easier. . . . It was always an open book test. With this [licensing] test it was all memory." *Id*. at 45-46.

She also testified that she had social issues and avoided places with "too many people." *Id*. at 46. She testified that she stayed away from places with "more than one or two male[s] in an area" and that she was "more cautious and aware of [her] surroundings." *Id*. at 46-47. To illustrate the effect of this avoidance on her daily life, Pardini explained that once, on a trip to the VA office in San Francisco:

> [T]his gentleman came up to me and starting hitting on me, giving me his phone number, got real close -- got real nervous. . . . I quit going to the VA and any alternate routes -- if I go to the VA I don't go through the front door where he possibly could be. . . . I went back a couple of times for tests and went in an alternate direction where I would not have the options to run into this individual.

15

*Id.* at 47.

Pardini testified that she avoided going out in public and drove her daughter to her mother's house to play outside because "it's too stressful to have her out in the area where we live" even though she lives in a building with a community play area. *Id.* at 48. Pardini also testified that she tried to limit her grocery shopping to once a month to reduce her stress, and that she "usually tr[ied] to go in the late hours where I know there's less people. . . . Or the early mornings when there's fewer people there that I have to run into." *Id.* at 48.

Pardini's attorney pointed out that she was "crying here at the, at the hearing today." *Id.* at 48-49. Pardini testified that such crying spells happened often: "I find myself crying at least four or five times a week – sometimes daily." *Id.* at 49. She also described problems sleeping –"I'm averaging four or five hours on a good day" – due to nightmares. *Id.*

Pardini described her typical day with her daughter:

> [W]e get up. If we have events going on during the day we'll get up early, we'll jump in the shower, get ourselves ready, and out the door we go. . . . I'll drop my daughter off at skating. And I'll go back home or my mom will invite me down for something to drink at one of the restaurants in town. So – it's not a very busy restaurant. . . . And then we'll head back. And I'll pick my daughter up.

*Id.* at 49. At home, Pardini made "simple" meals like TV dinners and hot dogs. *Id.* at 50. Pardini also talked about doing "arts and crafts" with her daughter and nephew. *Id.* She testified that she was unable to maintain her house without help. *Id.* She stated that she attended church on Sundays. *Id.* at 51. Pardini explained that she was not taking medication for her PTSD and that, while she had been seeing a counselor, she was not seeing one currently because she did not have childcare for her daughter. *Id.* at 50-51.

The Administrative Law Judge ("ALJ") questioned Pardini about her work taking pictures at horse and dog racing events. *Id.* at 52. The ALJ asked whether the tracks were crowded; Pardini replied: "I was on the inside so I wasn't around the crowds. I was in the infields." *Id.* Her mother had been the photographer, Pardini explained, but had to stop because of health issues. *Id.* at 52-54. Pardini also wrote articles about the races, but was "let go" in June. *Id.* at 53. The ALJ also questioned Pardini about her past charge of welfare fraud. *Id.* at 54. Pardini testified that the

16

charge was a result of a misunderstanding. *Id*. at 54-55. Pardini was not able to pay back the overpayment. *Id*. at 55. She testified that she was also no longer in school pursuing a second Master's degree. *Id*. at 56.

The ALJ then sought testimony from Jeff Malmuth, the vocational expert ("VE"). *Id*. at 58. The VE asked Pardini to provide more information about her job as a "logistics coordinator," which she performed while deployed. *Id*. at 59. Pardini explained that she "would receive the paperwork from the convoys coming out of Iraq or going into Iraq and take any information of any possible sightings of terrorists." *Id*. The VE then summarized Paridini's work history dating back fifteen years: she worked as a "general house worker," a "hospital cleaner," a "home attendant," a "life insurance sales agent," in "logistics and combat service," and as a security guard. *Id*. at 59-61. The ALJ posed the following hypothetical:

> [L]et's assume a person of claimant's age, education, and prior work experience who is able to perform medium work with six hours of standing and walking; being off-task approximately five percent of the work day; with . . . . [o]ccasional [sic] exposure to crowds and occasional exposure to public.

*Id*. at 62. The VE testified that such a person would be able to work as a "general house worker" and a "hospital cleaner," both jobs Pardini held in the past. *Id*. None of Pardini's other past jobs would be suitable given the limitations in the hypothetical. *Id*. at 62-63.

The ALJ added to the hypothetical: "the individual further is limited to walking and standing four hours in an eight hour day with occasional stairs, ladders, ropes and scaffolds and crawling." *Id*. at 64. The VE testified that none of Pardini's prior work would be suitable for a person with such limitations, but that such a person could work as an "electrical accessories assembler" (approximately 28,000 jobs in the national economy), an "inspector and hand packager" (approximately 22,000 jobs in the national economy) and "production assembly" (approximately 7,000 jobs in the national economy). *Id*. at 64-65. The numbers of each job that he provided reflect the number of jobs "after a 25 percent erosion" to accommodate Pardini's physical limitations. *Id*. at 64.

The ALJ then "add[ed] to hypothetical 2 that the individual is limited to walking fifteen minutes and then must sit for one hour and do that kind of a rotation throughout the day." *Id*. at

65.  Such a person, the VE replied, would not be able to do the three jobs he had listed.  *Id.*

However, such a person would, in the VE's opinion, be able to perform "a sedentary type job with

only occasional public contact" like a "surveillance system monitor" with a Specific Vocational

Preparation level (SVP) of 2 (approximately 8,000 jobs in the national economy), a "nut sorter"

with an SVP of 2 (approximately 22,000 jobs in the national economy), or an "ampoule sealer"

with an SVP of 3 (approximately 16,000 jobs in the national economy).  *Id.* at 65-66.  If "the

individual would be off-task approximately 15 percent of the work day," the VE testified that there

would not be any suitable jobs in the national economy.  *Id.* at 66.

### E.    Regulatory Framework for Determining Disability

#### 1.   Five-Step Analysis

When a claimant alleges a disability and applies to receive Social Security benefits, the

ALJ evaluates the claim using a sequential five step process.  20 C.F.R. § 404.1520(a)(4).  At step

one, the ALJ determines whether the applicant is engaged in "substantial gainful activity."  20

C.F.R. § 404.1520(a)(4)(I).  Substantial gainful activity is "work activity that involves doing

significant physical or mental activities . . . that the claimant does for pay or profit."  20 C.F.R.

§ 220.141(a)-(b).  If the claimant is engaging in such activities, the claimant is not disabled; if not,

the evaluation continues at step two.

At step two, the ALJ considers whether the claimant has a severe and medically

determinable impairment.  Impairments are severe when "there is more than a minimal limitation

in [the claimant's] ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant

does not suffer from a severe impairment, she is not disabled; if she does have a severe

impairment, the ALJ proceeds to step three.

At step three, the ALJ turns to the Social Security Administration's listing of severe

impairments (the "Listing").  *See* 20 C.F.R. § 404, subpt. P, app. 1.  If the claimant's alleged

impairment meets one of the entries in the Listing, the claimant is disabled.  If not, the ALJ moves

to step four.

At step four, the ALJ assesses the claimant's residual functional capacity, or RFC, to

assess whether the claimant could perform her past relevant work.  20 C.F.R. § 404.1520(a)(1).

18

The RFC is a determination of "the most [the claimant] can do despite [the claimant's] limitations." 20 C.F.R. § 404.1520(a)(1). The ALJ considers past relevant work to be "work that [the claimant] has done within the past fifteen years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how do to it." 20 C.F.R. § 404.11560(b)(1). If the claimant is able to perform past relevant work, she is not disabled; if she is not able to perform such past relevant work, the ALJ continues to step five. In the case of claimants who are fifty-five or older, are restricted to sedentary work, have no transferable skills, and have not completed any relevant vocational education, the Commissioner will usually not offer any evidence of work meeting the claimant's RFC and the ALJ will decide disability based on the claimant's ability to perform past work. 20 C.F.R. § 404, subpt. P, app. 2 § 201.00(d).

At the fifth and final step, the burden shifts from the claimant to the Commissioner to "identify specific jobs existing in substantial numbers in the national economy that the claimant can perform despite her identified limitations." *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (citing *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995)). If the Commissioner is able to identify such work, then the claimant is not disabled; if not, the claimant is disabled and entitled to benefits. 20 C.F.R. § 404.1520(g)(1).

### 2. Supplemental Regulations for Determining Mental Disability

The Social Security Administration has supplemented the five-step general disability evaluation process with regulations governing the evaluation of mental impairments at steps two and three of the five-step process. *See generally* 20 C.F.R. § 404.1520a;[13] *see also Clayton v. Astrue*, No. CIV 09-2282-EFB, 2011 WL 997144, at *3 (E.D. Cal. Mar. 17, 2011) (citing *Maier v. Comm'r of Soc. Sec. Admin.*, 154 F.3d 913 (9th Cir. 1998)). First, the Commissioner must

---

[13] Effective January 17, 2017, the Social Security Administration changed the language of § 404.1520a from "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation" to "[u]nderstand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." *See* Revised Medical Criteria for Evaluating Mental Disorders, 74 Fed. Reg. 51336, 51341 (August 19, 2010); 81 Fed. Reg. 66138, 66159-60 (Sept. 26, 2016). Because Pardini filed her application in 2014, AR at 154, the language before the rules change applies and the Court will apply the language in effect at the time of Pardini's filing for the purpose of this opinion.

determine whether the claimant has a medically determinable mental impairment. 20 C.F.R. § 404.1520a(b)(1). Next, the Commissioner must assess the degree of functional limitation resulting from the claimant's mental impairment with respect to four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(b)(2), (c). Finally, the Commissioner must determine the severity of the claimant's mental impairment and whether that severity meets or equals the severity of a mental impairment listed in Appendix 1. 20 C.F.R. § 404.1520a(d). If the Commissioner determines that the severity of the claimant's mental impairment meets or equals the severity of a listed mental impairment, the claimant is disabled. *See* 20 C.F.R. § 404.1520a(a)(4)(iii). Otherwise, the evaluation proceeds to step four of the general disability inquiry. *See* 20 C.F.R. § 404.1520a(d)(3).

Appendix 1 provides impairment-specific "Paragraph A" criteria for determining the presence of various listed mental impairments, but all listed mental impairments share certain "Paragraph B" severity criteria in common (and some have alternative "Paragraph C" severity criteria). *See generally* 20 C.F.R. § 404, Subpt. P, App. 1 at 12.00. Therefore, any medically determinable mental impairment—i.e., one that satisfies the Paragraph A criteria of one or more listed mental impairments—is sufficiently severe to render a claimant disabled if it satisfies the general Paragraph B criteria, which require that the claimant suffers at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. *See id.* A "marked" limitation is one that is "more than moderate but less than extreme" and "may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [a claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." *Id.* at 12.00C.

This evaluation process is to be used at the second and third steps of the sequential evaluation discussed above. Social Security Ruling 96-8p, 1996 WL 374184, at *4 ("The adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C'

20

criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process."). If the Commissioner determines that the claimant has one or more severe mental impairments that neither meet nor are equal to any listing, the Commissioner must assess the claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3). This is a "mental RFC assessment [that is] used at steps 4 and 5 of the sequential process [and] requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments . . . . " Social Security Ruling 96-8p, 1996 WL 374184, at *4.

### F.     The ALJ's Decision

In her September 16, 2019 decision, the ALJ concluded that Pardini "was not under a disability within the meaning of the Social Security Act" between her alleged onset date of January 1, 2010 and the date last insured of September 30, 2015. *Id*. at 16, 25. The ALJ found that Pardini did not engage in substantial gainful employment during that period. *Id.* at 18. At step two, the ALJ found that Pardini had the following severe impairments: "major dysfunction of the right knee, status post surgery; post traumatic stress disorder (PTSD), cervical degenerative disease, headaches and mild scoliosis." *Id*. At step three she found that none of these impairments met or medically equaled any of the Listings in 20 CFR Part 404, Subpart P, Appendix 1. *Id*. At step four, the ALJ found Pardini had the following Residual Functional Capacity (RFC): "to perform medium work as defined in 20 CFR 404.1567(c) except that the claimant can stand and walk 4 hours in an 8 hour workday, would be off task 5% of the workday, occasionally climb stairs, ladders, ropes, scaffolds, and crawl; requires occasional exposure to crowds, and occasional exposure to the public." *Id*. at 20.

The ALJ's RFC was based, in part, on her conclusion that while Pardini's claimed impairments "could reasonably be expected to cause the alleged symptoms," her "statements concerning the intensity, persistence and limiting effects of those symptoms [were] not entirely consistent with the medical evidence and the other evidence in the record." AR at 22. First, the ALJ addressed Pardini's testimony about the physical pain in her knee, which the ALJ found was

21

"out of proportion to the objective medical evidence of record." *Id.* She also found that Pardini's

reports of daily activities were inconsistent with her pain testimony:

> While she alleged she was only able [to] stand for 15 minutes and lift 20 pounds, the record does not support this degree of limitation. For instance, in March 2013, claimant was noted to take care of 2-year-old daughter and babysit her 1-year-old nephew [AR at 606]. In fact, she was able to take care of the children throughout the relevant period. Furthermore, the treatment record shows normal examinations after having knee surgery and she reported she was able to walk 3 miles a day [AR at 888].

*Id.* She also found that the objective evidence did not support Pardini's pain testimony: "After her

most recent fall, the x-rays showed no fracture." *Id.* (citing *id.* at 850). She further found that the

objective evidence did not support Pardini's testimony about her back and shoulder pain: "the x-

rays [of the shoulder] were normal and the x-rays of the lumbar and cervical spine showed only

arthritis." *Id.* Overall, the ALJ "limited [Pardini] to standing and walking 4 hours in an 8-hour

workday with occasionally climb stairs, ladders, ropes, and scaffolds, and crawl due to knee pain,"

and "considered and accounted for" back and shoulder impairments in her RFC determination. *Id.*

The ALJ also noted:

> Despite her impairments, the claimant has engaged in a somewhat normal level and range of daily activity and interaction. The claimant admitted activities of daily living including preparing meals, performing chores, interacting with others of [sic] Facebook, performing personal care tasks, and shopping. Some of the physical and mental abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining employment. The claimant's ability to participate in such activities is not consistent with her allegations of disabling functional limitations.

*Id.* at 23.

The ALJ then turned to Pardini's testimony about her PTSD diagnosis, noting that "the

record shows [Pardini] was mostly free from avoidant, re-experiencing, or arousal symptoms of

PTSD [AR at 773]; and her recent mental status exam are normal. [AR at 838, 846]." *Id.* Based

on her review of the record, the ALJ limited Pardini to "being off task 5% of the workday with

occasional exposure crowds [sic] and occasional exposure to the public." *Id.* She discussed the

opinion of the state agency consultative physicians that Pardini's impairments were "nonsevere."

*Id.* (citing *id.* at 70-80 (May 2014 reports of Harvey Bilik, Psy.D. and S. Jaituni, M.D.); 82-92 (July 2014 reports of M. Tambellini, M.D. and L. Colsky, M.D.)). She "afford[ed] little weight to this opinion in light of the updated medical evidence received at the hearing level" about Pardini's worsening mental health symptoms and knee issues. *Id.*

The ALJ also addressed the VA disability determination. *Id.* While the record contained "a VA disability rating of 100% due to posttraumatic stress disorder," the ALJ gave only "partial weight" to the VA's opinion "because the VA has different criteria for determining disability and did not have the longitudinal history of the claimant's functional abilities through the date of hearing." *Id.* She also interpreted GAF scores in the record, which ranged between 51-60, to "show[] moderate symptoms consistent with the limitations" described in the RFC. *Id.* She explained that GAF scores "are necessarily subjective" and "may not relate to a claimant's ability to work." *Id.* She ultimately found that Pardini's overall GAF rating was consistent with the limitations reflected in the RFC. *Id.*

Taking into account the limitations reflected in her RFC, the ALJ listed the jobs that the VE had found suitable for Pardini to perform: an electrical accessories assembler, an inspector hand packager, and working in production assembly. *Id.* at 25. All three of these jobs have a "light level of exertion with an SVP of 2." *Id.* The ALJ also acknowledged that "***the vocational exert*** [sic] ***testified that all numbers for the jobs provided have been eroded by 25% due to the reduction in the number of hours of standing and walking.***" *Id.* at 25 (emphasis in original). Ultimately, the ALJ found that Pardini was able to perform work that exists in significant numbers in the national economy and, therefore, was not disabled. *Id.*

## G. Plaintiff's Contentions

In her summary judgment motion, Plaintiff argues that the ALJ erred by: 1) failing to give the VA's finding that Pardini was disabled "great weight"; 2) failing to adhere to the mandatory procedures established to evaluate mental illness under 20 C.F.R. § 404.1520(a) and Social Security Rulings 85-15 and 85-16; 3) failing to provide adequate reasons for rejecting Pardini's testimony about the severity of her symptoms relating to knee pain and PTSD; and 4) failing to meet the Commissioner's burden of proof at step five in light of the "25 % erosion" of jobs

resulting from the limitation on Pardini's ability to stand and walk four hours in an eight-hour work day.

### III.   ANALYSIS

#### A.   Legal Standard for Determining Disability

District courts have jurisdiction to review the final decisions of the Commissioner and may affirm, modify, or reverse the Commissioner's decisions with or without remanding for further hearings. 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3). "This court may set aside a denial of Social Security disability insurance benefits when the [Commissioner's] findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 575–76 (9th Cir. 1988). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion" and that is based on the entire record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "'Substantial evidence' means more than a mere scintilla," *id.*, but "less than preponderance." *Desrosiers*, 846 F.2d at 576. Even if the Commissioner's findings are supported by substantial evidence, the decision should be set aside if proper legal standards were not applied when weighing the evidence. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1978)). In reviewing the record, the Court must consider both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

#### B.   Whether the ALJ's Erred by Failing to Give Sufficient Weight to the VA's 100% Disability Finding

##### 1.   Legal Standards Governing Weight to Be Afforded VA Disability Findings

In *McCartey v. Massanari*, the Ninth Circuit addressed, as a matter of first impression, "the evidentiary significance of a VA disability rating." 298 F.3d 1072, 1075 (9th Cir. 2002). The court in *McCartey* "agree[d] with all of the other circuits that have considered the question and [held] that although a VA rating of disability does not necessarily compel the SSA to reach an identical result, 20 C.F.R. § 404.1504, the ALJ must consider the VA's finding in reaching his

decision." *Id*. The Court went on to hold that ALJ's must "ordinarily give great weight to a VA determination of disability," explaining its conclusion as follows:

> We so conclude because of the marked similarity between these two federal disability programs. Both programs serve the same governmental purpose—providing benefits to those unable to work because of a serious disability. Both programs evaluate a claimant's ability to perform full-time work in the national economy on a sustained and continuing basis; both focus on analyzing a claimant's functional limitations; and both require claimants to present extensive medical documentation in support of their claims. Compare 38 C.F.R. § 4.1 et seq. (VA ratings) with 20 C.F.R. § 404.1 et seq (Social Security Disability). Both programs have a detailed regulatory scheme that promotes consistency in adjudication of claims. Both are administered by the federal government, and they share a common incentive to weed out meritless claims. The VA criteria for evaluating disability are very specific and translate easily into SSA's disability framework.

*Id*. at 1076. Nonetheless, the court in *McCartey* held that "[b]ecause the VA and SSA criteria for determining disability are not identical . . . the ALJ may give less weight to a VA disability rating if he gives persuasive, specific, valid reasons for doing so that are supported by the record. *Id*. (citing *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001)).

### 2. Discussion

The ALJ discounted the VA's finding of 100% disability for two reasons. First, she noted that "the VA has different criteria for determining disability." AR at 23. Second, she found that the VA "did not have the longitudinal history of the claimant's functional abilities available through the date of this hearing." *Id.* The Court finds that these are not "persuasive, specific, valid reasons" for failing to give "great weight" to the VA's finding.

The ALJ's reliance on the VA's use of "different criteria" to determine disability is insufficient as a matter of law. *See Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009) ("Insofar as the ALJ distinguished the VA's disability rating on the general ground that VA and SSA disability inquiries are different, her analysis fell afoul of *McCartey*."); *Berry v. Astrue*, 622 F.3d 1228, 1236 (9th Cir. 2010) ("the ALJ noted that the SSA is not bound by the VA's determination because the governing rules differ. This is not a "'persuasive, specific, valid reason[ ]' for discounting the VA determination.").

The ALJ's second reason for giving the VA's disability determination only partial weight

25

also does not satisfy *McCartey*.  An ALJ may be "justified in rejecting the VA's disability rating on the basis that [the ALJ] had evidence the VA did not, which undermined the evidence the VA did have." *Valentine*, 574 F.3d at 689.  That is not the case here, however.  It is true that the ALJ had treatment records for 2014-2016 that the VA did not have, and that these included notes by Friedlander that Pardini was not experiencing symptoms of PTSD.  *See, e.g.,* AR at 500, 503, 515, 519, 523, 533, 781, 782, 942.  However, Friedlander's treatment notes in the record dated after the VA decision are very similar to the ones that the VA and Dr. Boenniman reviewed and did not rely upon, instead finding that the record as a whole supported a finding of 100% disability based on service-connected PTSD.  Compare AR at 621, 658, 673, 684, 702, 703, 711-712, 715 (treatment notes from Friedlander that were reviewed by the VA, describing Pardini's mood positively and noting that Pardini "[c]ontinues to be free from avoidant, re-experiencing, or arousal symptoms of PTSD" in treatment notes dated before the VA's review) with *id*. at 500, 503, 515, 519, 522-23, 533, 580-82, 608, 781, 782, 942 (noting the same after the VA's review).  To the extent that the VA implicitly placed little weight on Friedlander's observations regarding Pardini's symptoms, the ALJ was required to offer  persuasive, specific, valid reasons for crediting Friedlander's opinions over Dr. Broennimann's and consequently reaching the opposite conclusion from the VA's.  The Court further notes that the ALJ's reliance on the "longitudinal record" is inconsistent with her own conclusion that the opinion of the state agency doctors that Pardini's impairment was non-severe was entitled "little weight" because Pardini's condition had worsened since 2014.

Moreover, the Court finds that the ALJ mischaracterized Friedlander's treatment notes.  Even as Friedlander observed in some treatment notes that post-date the VA's decision that Pardini was not experiencing symptoms of PTSD, she consistently described Pardini as  a "single mother . . . who is 100% SC for PTSD," see AR at 838, 854, 864, 871, and she did not ever suggest that the PTSD diagnosis was no longer accurate.  In addition, in many of these notes Friedland did not state that Pardini was symptom-free and instead described symptoms that were consistent with the findings of the VA and Dr. Broennimann.  For example, Friedlander's treatment notes from March 29, 2016 state that "[d]ifficulties with setting and maintaining

26

personal boundaries contribute to chaos and stress in veteran's life." AR at 838. Similarly, on August 13, 2015, Friedlander described Pardini's mood as "stressed and depressed." AR at 854. These notes suggest an ebb and flow of PTSD symptoms.

For these reasons, the Court finds that the ALJ's reliance on the "longitudinal record" was not a "persuasive, specific, valid reason" for failing to give the VA's finding of 100% disability "great weight."

### C. Whether the ALJ Erred by Failing to Adhere to SSA Procedures for Evaluating Mental Illness

Pardini contends that the ALJ erred in finding that she would be off task 5% of the work day and limited to occasional exposure to crowds and the public because this conclusion is not supported by medical opinions and the ALJ is not permitted to reach independent medical conclusions. Motion at 12 (citing *Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000) and *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996)). Pardini points to Social Security Rulings ("SSR") 85-15 and 85-16 in support of her argument. *Id.* at 1314. She further asserts that to the extent the ALJ relies on the opinions of non-examining doctors who reviewed her records, *see* AR 23 (citing Exhibits 2A & 4A, AR at 71-80, 82-91), such opinions cannot, on their own, constitute substantial evidence. *Id.* at 14 (citing *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1995)). Pardini argues that these do not satisfy this requirement. The Court concludes that ALJ supported her conclusion with medical evidence but that that evidence did not constitute substantial evidence.

In determining limitations associated with mental impairments, the ALJ may consider, among other things, "[h]istory, findings, and observations from medical sources." SSR 85-16. SSR 85-16 emphasizes that "[m]edical evidence is critical to determinations of disability" because it "provides medical history, test results, examination findings, and observations, as well as conclusions of medical sources trained and knowledgeable in the diagnosis and treatment of diseases and disorders." *Id.* This medical evidence includes "[r]eports from psychiatrists and other physicians, psychologists, and other professionals working in the field of mental health . . . ." *Id.* While SSR 85-16 does not appear to preclude the ALJ from relying on opinions of non-examining physicians, the case law establishes that "[t]he opinion of a nonexamining physician

cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Lester v. Chater*, 81 F.3d at 831; *see also Magallanes v. Bowen*, 881 F.2d 747, 752 (9th Cir. 1989) ("[a] report of a non-examining, non-treating physician should be discounted and is not substantial evidence when contradicted by all other evidence in the record").

Here, it appears that the ALJ's conclusion with respect to the 5% limitation was not based on the opinions of nonexamining state agency physicians as she states that she gave these opinions "little weight." Rather, her conclusion is based on Friedlander's treatment notes, which the ALJ cites in support of her conclusion that Pardini is "mostly free from avoidant, re-experiencing, or arousal symptoms." *See* AR at 23. As discussed above, however, the ALJ mischaracterized Friedlander's treatment notes, ignoring treatment notes in which Friedlander observed symptoms consistent with Pardini's PTSD diagnosis and the findings of Dr. Broennimann and the VA, suggesting that rather than being symptom-free, Pardini was experiencing the ebb and flow of her impairment. Therefore, the Court finds that the ALJ did not impermissibly reach her own independent opinion as to the 5% limitation but that her conclusion is not supported by substantial evidence.

**D.     Whether the ALJ Provided Adequate Reasons for Failing to Fully Credit Pardini's Subjective Symptom Testimony**

**1. Legal Standards Governing Evaluation of Claimant Testimony**

An ALJs is required to engage in a two-step analysis when evaluating a claimant's subjective testimony about the severity of her symptoms. *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id*. (internal quotations and citations omitted). "If the claimant satisfies the first step of this analysis, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Id*. (quoting *Smolen v. Chater*, 80 F.3d at 1281). Here, the ALJ found that Pardini satisfied the first step of the analysis and therefore was required to provide

"specific, clear and convincing reasons" for rejecting Pardini's testimony with respect to the severity of her symptoms.

"[T]he Commissioner may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998); *see also* 20 C.F.R. § 404.1529(c)(2) (assuring claimants that an ALJ "will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."). Moreover, "an ALJ does not provide specific, clear, and convincing reasons for rejecting a claimant's testimony by simply reciting the medical evidence in support of his or her residual functional capacity determination." *Brown-Hunter v. Colvin*, 806 F.3d 487, 489 (9th Cir. 2015). Finally, "[a]n ALJ may not selectively rely on some entries in the record while ignoring others." *Lacy v. Saul*, No. 19-CV-00140-SI, 2019 WL 4845965, at *8 (N.D. Cal. Oct. 1, 2019) (citing *Holohan v. Massanari*, 246 F.3d 1195, 1207 (9th Cir. 2001)).

### 2. Discussion

Pardini contends the ALJ failed to provide "specific, clear and convincing" reasons for declining to credit her testimony that she cannot stand for more than fifteen minutes due to knee pain, relying on a treatment note from January 2015 in which she reported that she was walking three miles a day while ignoring medical records showing that she subsequently injured her right knee when she fell down the stairs, resulting in anteromedial right knee pain. Motion at 16 (citing AR at 821, 888). Likewise, Pardini contends the ALJ did not provide adequate reasons for rejecting her testimony with respect to her PTSD symptoms because she "cherrypicked" the record to support her conclusion that Pardini had recovered from her PTSD. *Id.* The Court agrees.

#### a. Knee Pain

The ALJ rejected Pardini's testimony that she could not stand longer than 15 minutes because of pain in her right knee, finding that this testimony was "out of proportion to the objective medical evidence of record" and inconsistent with Pardini's daily activities. AR at 22. She cited a treatment note from January 2015 in which Pardini reported she was walking three

miles a day, as well as Pardini's ability to prepare meals, perform household chores and personal care tasks, and go shopping, which the ALJ found to be inconsistent with her pain testimony. AR at 23.

The ALJ's reliance on the "objective medical evidence of record" to support her conclusion is misplaced because she ignored significant evidence in the record relating to Pardini's knee pain. First, in describing the medical findings from Pardini's November 25, 2015 knee x-ray, the ALJ notes that "x-rays showed no fracture" *id*. at 22, overstating the finding that "no fracture or dislocation [was] identified" while ignoring the fact that the doctor who interpreted the x-ray did not rule out the possibility of a fracture, noting that if Pardini's symptoms persisted or worsened a repeat x-ray, MRI or CT scan should be considered to "detect a hairline non-displaced fracture that is occult by plain film exam." *Id*. at 821. The ALJ also did not discuss the other findings from this x-ray, such as "moderate medial compartment joint space there are consistent with chondropathic disease" and findings that "may indicate decreased bone mineral density such as osteopenia/osteoporosis." *Id*. at 821. Nor did the ALJ address the doctor's note in the x-ray report stating: "See the report of the prior MRI of the right knee from 8/21/2014 which are reported in part a radial tear of the posterior horn of the lateral meniscus and chondromalacia patella." *Id*.; *see also id*. at 823 (MRI report from August 21, 2014). The reference to the prior MRI report indicates that the doctor who interpreted the x-ray believed the findings of that report were also relevant to Pardini's right knee symptoms.

The ALJ also did not address a report from an MRI performed on December 14, 2015 revealing "[t]otal lack of hematopoietic red marrow signal in the knees bilaterally" suggestive of "bony demineralization" and "lateral offset of the patellae bilaterally, with associated local moderate degenerative on the right side." AR at 814-816.

In light of this evidence in the record related to Pardini's right knee pain, the ALJ's reliance on a single statement in the November 25, 2015 x-ray report that no fracture was identified was not a clear and convincing reasons for discrediting Pardini's pain testimony. *See Lacy v. Saul*, No. 19-CV-00140-SI, 2019 WL 4845965, at *8 (N.D. Cal. Oct. 1, 2019).

The ALJ's reliance on Pardini's reports of her daily activities also falls short. In assessing

whether a claimant's pain testimony should be credited, an ALJ may consider the claimant's daily activities. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). However, "ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." *Garrison v. Colvin*, 759 F.3d 995, 1016 (9th Cir. 2014). Thus, "[r]ecognizing that 'disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations,' [the Ninth Circuit has] held that '[o]nly if [her] level of activity were inconsistent with [a claimant's] claimed limitations would these activities have any bearing on [her] credibility'" *Id.* (quoting *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998)).

The ALJ offered no explanation for her conclusion that Pardini's caring for her nephew and daughter was inconsistent with her testimony that she experienced swelling and pain in her right knee if she stood for more than fifteen minutes. Moreover, Pardini's testimony about her routine with her daughter is not inconsistent with her pain testimony, consisting of dropping her off and picking her up from activities, preparing simple meals, working with her on her letters and numbers, and doing arts and crafts at home. AR at 49-50. Pardini also testified that she sees her sister, who lives "right next store," every day and that she gets "help from her with [her] child." AR at 36. Therefore, reliance on these activities improperly penalized Pardini for attempting to lead a normal life.

The ALJ's reliance on a treatment note from January 2015 reflecting that Pardini was walking three miles a day is similarly misplaced. While the ability to walk three miles a day is undoubtedly inconsistent with an inability to stand for more than fifteen minutes, the ALJ did not explain why this treatment note was an accurate reflection of Pardini's limitations after her fall in October 2015; likewise, she offered no explanation for her conclusion that Pardini's ability to walk three miles in January 2015 was inconsistent with Pardini's testimony that her pain had gotten worse after her fall.

Similarly, the ALJ did not offer a clear and convincing reasons for discrediting Pardini's testimony based on "preparing meals, performing chores, interacting with others of [sic]

Facebook, performing personal care tasks, and shopping." AR at 23. "[D]aily activities may be grounds for an adverse credibility finding 'if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting.'" *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (quoting *Fair v. Astrue*, 885 F.2d 597, 603 (9th Cir. 1989)). Yet the ALJ did not make any findings as to how much time Pardini spent engaged in these activities, instead noting only that "[s]ome of the physical and mental abilities are the same as those necessary for obtaining and maintaining employment." *Id.* Nor did she explain why any of these activities were inconsistent with Pardini's testimony with respect to her right knee pain. Therefore, these activities also are not a clear and convincing reason to reject Pardini's testimony with respect to her knee pain.

In sum, neither the medical record nor the daily activities cited by the ALJ provides a clear and convincing reason to reject Pardini's testimony about the severity of her knee pain. The Court therefore also concludes that the ALJ's finding that Pardini could stand and walk four hours in an eight-hour workday was not supported by substantial evidence.

b. PTSD Symptoms

The ALJ found that the objective evidence in the record did not support the symptoms of PTSD that Pardini testified to during her hearing because "the record shows claimant was mostly free from avoidant, re-experiencing, or arousal symptoms of PTSD; and her recent mental status exam are normal." AR at 23 (internal citations omitted). She also apparently relied on Pardini's testimony that she went shopping and interacted with other people on Facebook in declining to credit Pardini's testimony about her PTSD symptoms. *Id.* Neither of these reasons satisfies the clear and convincing reason requirement for discrediting a claimant's testimony about the severity of her symptoms.

First, the opinions the ALJ cited in support of her conclusion that Pardini was not experiencing PTSD symptoms are cherry-picked from Friedlander's treatment note. The ALJ ignored treatment notes from Friedlander that support a contrary conclusion, as discussed above. Given that the severity of the PTSD symptoms observed by Friedlander appeared to vary, the ALJ was required to explain why the treatment notes she relied upon "were, in fact, examples of

1  improvements or true discrepancies, rather than the ebb and flow of [Pardini's] mental

2  impairment[]." *Caceres v. Colvin*, No. 3:14-CV-05908-DWC, 2015 WL 4040727, at *7 (W.D.

3  Wash. July 1, 2015) (citing *Garrison*, 759 F.3d at 1018); *see also Payne v. Berryhill*, No.

4  216CV01958RSLDWC, 2017 WL 3142107, at *3 (W.D. Wash. June 12, 2017), report and

5  recommendation adopted, No. 216 CV 01958 RSLDWC, 2017 WL 3129766 (W.D. Wash. July

6  24, 2017) ("In order for the ALJ to rely on examples of inconsistent symptom severity or

7  treatment, the ALJ was required to explain why the examples of inconsistent mental health

8  symptoms were, in fact, examples of improvements or true discrepancies, rather than the ebb and

9  flow of the claimant's mental impairments."). Further, as discussed above, the ALJ failed to offer

10  an adequate explanation for rejecting the opinions of Dr. Broennimann, whose opinions

11  contradicted the ALJ's conclusion that Pardini was not experiencing symptoms of PTSD during

12  the relevant time period between 2010 and 2015.

13        The ALJ also did not offer specific, clear and convincing reason for rejecting Pardini's

14  symptom testimony based on testimony that she sometimes goes shopping and interacts with

15  people on Facebook.  Pardini testified that she tries to complete all her shopping in one trip to the

16  grocery store every month so she does not "need to go back" and that she tries to do her shopping

17  in the "late hours" or "early mornings" "when there's fewer people that I have to run into."  AR at

18  48.  Thus, her testimony that she sometimes goes shopping is not inconsistent with her testimony

19  that she has difficulty getting along with other people, fears men, avoids crowds and cries daily.

20  AR at 46-48.   Nor is use of Facebook inconsistent with that testimony.   Furthermore, the ALJ did

21  not establish that either of these activities constituted a substantial part of Pardini's day or explain

22  what transferable skills these activities demonstrated.

23        Therefore, the Court concludes that the ALJ did not offer clear and convincing reasons for

24  declining to credit Pardini's testimony with respect to her PTSD symptoms and that the ALJ's

25  conclusions with respect to the severity of Pardini's PTSD symptoms is not supported by

26  substantial evidence.

      **E.**    **Whether the ALJ Appropriately Accounted for a 25% Reduction in the VE's Workforce**

27        Pardini argues that the Commissioner's burden of proof is not met at step five because

28

"the vocational exert testified that all numbers for the jobs provided have been eroded by 25% due to the reduction [in] the number of hours of standing and walking" but the ALJ did not explain how the jobs that were identified by the VE – all of which were at the light level of exertion and therefore require "a good deal of walking or standing" – could be performed by Pardini. Motion at 16-17 (citing AR at 25; 20 C.F.R. § 404.1567). According to Pardini, "[n]one of these jobs allow a[n] erosion of 25%." *Id.*

The Court rejects Pardini's argument, which appears to be based on a misunderstanding of the VE's testimony. The VE, based on his expertise, offered testimony that the number of jobs available in the categories he had identified would be reduced by 25% if a limitation to four hours of standing were added to the hypothetical, that is, that 75% of the jobs available in the national economy require *less* than a full range of light work to the extent that they can be performed by an individual with this limitation. As Plaintiff does not dispute that the VE is an expert in this area, the Court finds that the ALJ did not err in relying on his testimony with respect to the 25% erosion in numbers.

## F. Remedy

"When the ALJ denies benefits and the court finds error, the court ordinarily must remand to the agency for further proceedings before directing an award of benefits." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017) (citing *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014)). This is because "an ALJ's failure to provide sufficiently specific reasons for rejecting the testimony of a claimant or other witness does not, without more, require the reviewing court to credit the testimony as true." *Treichler*, 775 F.3d at 1106. However, the court may make an exception and order an immediate award of benefits under the "credit-as-true" rule. *Leon v. Berryhill*, 880 F.3d at 1045 (citing *Garrison*, 759 F.3d at 1019).

The credit-as-true rule requires the court to conduct a three-part analysis. *Id.* First, the court must ask whether the "ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion." *Id.* at 1020. Next, the court asks "'whether there are "outstanding issues that must be resolved before a disability determination can be made," . . . and whether further administrative proceedings would be useful.'" *Id.* (quoting *Treichler*, 775

F.3d at 1101) (quoting *Moisa v. Barnhart*, 367 F.3d 882, 887 (9th Cir. 2004)). If these first two conditions are satisfied, the court then "credit[s] the discredited testimony as true for the purpose of determining whether, on the record taken as a whole, there is no doubt as to disability." *Id.* Only if there "is no question that a finding of disability would be required if claimant's testimony were accepted as true" and "further administrative proceedings would not be useful" may the court order an immediate award of benefits rather than remanding for further proceedings. *Id.*

It is within the court's discretion whether or not to award benefits under the credit-as-true rule; even "the ALJs failure to provide sufficient reasoning despite a fully developed record, without any conflicts, gaps, or ambiguities, does not automatically result in a determination that the claimant is therefore credible and should be awarded benefits immediately." *Id.* Rather, the rule is applied flexibly and an award of benefits may denied "even when a claimant would be otherwise entitled to benefits under the credit-as-true[rule] . . . when the record as a whole creates serious doubt as to disability." *Id.*

Here, the Court has found that the ALJ did not offer legally sufficient reasons for rejecting Pardini's testimony with respect to the severity of her knee pain and her symptoms of PTSD. Even if the Court were to credit this testimony as true, however, the evidence is not sufficiently developed to establish without any doubt that the limitations associated with these symptoms would preclude all work. With respect to Pardini's knee pain, the ALJ's testimony indicates that the addition of a limitation to fifteen minutes of standing or walking to the current RFC would not necessarily preclude sedentary work. *Id.* at 65. Furthermore, even if the Court credits as true Pardini's testimony regarding her PTSD symptoms, there is not sufficient testimony from the VE to determine that there is no work that Pardini could perform with such limitations.[14]

With respect to the VA's determination that Pardini is 100% disabled, if the VA's findings are credited as true, they establish that Pardini was disabled during the relevant period based on PTSD. The Court is troubled, however, that Pardini does not appears to have been examined or

---

[14] The VE did testify that if a limitation of being off task 15% of the time were added to the ALJ's hypotheticals none of the jobs he listed could be performed. AR at 66. However, it is not clear that Pardini's symptoms (as reflected in her own testimony) would support such a limitation, and the record is insufficiently developed to make such a determination.

evaluated by a psychiatrist or psychologist after Dr. Broennimann examined her in 2013, making it difficult to evaluate the significance of Friedlander's observations regarding Pardini's PTSD symptoms. As Dr. Broennimann apparently did not give great weight to Friedlander's treatment notes indicating that Pardini was not experiencing symptoms – and Friedlander's notes do not provide substantial evidence in support of the ALJ's RFC with respect to Pardini's PTSD for the reasons discussed above – such additional evidence would be helpful to establish whether Pardini's symptoms, while ebbing and flowing, were consistent with the VA's findings or if, instead, she was not experiencing significant PTSD symptoms (as at least some of Friedlander's treatment notes seem to suggest).

Accordingly, the Court exercises its discretion to remand to the Commissioner for further proceedings consistent with this opinion. This should include an evaluation of the record as a whole to determine Pardini's limitations with respect to her right knee pain and PTSD symptoms. In addition, Pardini should be permitted to submit additional evidence, including: 1) records of treatment providers with respect to her right knee and PTSD symptoms; and 2) any reports or evaluations of her PTSD diagnosis and symptoms performed by an examining physician or psychologists *after* 2013. With respect to Pardini's PTSD symptoms, the Commissioner should refer Pardini for examination and evaluation by a qualified independent consultative examiner for a report that addresses the severity of Pardini's PTSD symptoms unless the additional evidence submitted by Pardini with respect to her PTSD symptoms is sufficient to establish disability on that basis.

## IV. CONCLUSION

For the reasons discussed above, Pardini's motion is GRANTED, the Commissioner's motion is DENIED, and the matter is REMANDED to the Commissioner for further proceedings consistent with this order. The Clerk is instructed to enter a judgement accordingly and to close the file.

**IT IS SO ORDERED.**

Dated: March 16, 2020

_____
JOSEPH C. SPERO
Chief Magistrate Judge